1  CHRISTOPHER J. CANNON, State Bar No. 88034
   MATTHEW A. LAWS, State Bar No. 273697
2  Sugarman & Cannon
   737 Tehama Street, No. 3
3  San Francisco, CA 94103
   Telephone: 415-362-6252
4  Facsimile: 415-362-6431
   chris@sugarmanandcannon.com
5
   Attorneys for Defendant RONALD STEVEN SCHOENFELD
6
                  UNITED STATES DISTRICT COURT
7
                 EASTERN DISTRICT OF CALIFORNIA
8
                      SACRAMENTO DIVISION
9

10  UNITED STATES OF AMERICA,                Case No. 2:20-cr-00150-KJM

11            Plaintiff,                     **DEFENDANT RON SCHOENFELD'S**
                                             **SENTENCING MEMORANDUM and**
12            vs.                            **OBJECTIONS TO PSR**

13  RONALD STEVEN SCHOENFELD,

14            Defendant.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  INTRODUCTION

Ron Schoenfeld is a 65-year-old man who foolishly let his desire to help a family member, and himself, overwhelm his duty of loyalty to his employer, PG&E.  Ron Schoenfeld thought that he could assist his cousin's business and actually help PG&E fulfill its commitment to spreading business away from male dominated firms by assisting his cousin in navigating the PG&E bidding process.  That business provided quality, and cost competitive, trucking services and was actually nominated twice for the supplier of the year award.  We are not excusing what Ron Schoenfeld did.  He violated his duty of loyalty to his employer, but as he was assisting his cousin, he did not think he was stealing from PG&E; and PG&E did not lose money as a result of Schoenfeld's conduct.  Ron Schoenfeld thought he was just violating a rule in the handbook rather than engaging in criminal behavior.

Ron Schoenfeld was born in the Bay Area 65 years ago.  He has maintained stable employment, raised a blended family and has been a contributing member of the community.  There is no need for a prison sentence to emphasize the duty of loyalty owed to an employer.

## II.  THERE SHOULD BE NO ADJUSTMENT FOR ABUSE OF TRUST

We do not believe there should be an abuse of trust enhancement.  The abuse of trust enhancement is intended to apply when someone is a fiduciary or in a "position of public or private trust characterized by professional or managerial discretion."  USSG § 3B1.3 Note 1.  The new language of the application notes "places a significant limit on the types of positions subject to the abuse-of-trust enhancement."  See e.g. United States v. Contreras, 581 F.3d 1163, 1166 (9th Cir. 2009).  While Ron Schoenfeld was more than a low-level clerk, he was not a fiduciary or in a position of public or private trust.  He was a transportation manager with limited discretionary authority.  Note 1 to U.S.S.G.§ 3B1.3 clarifies that the abuse of trust adjustment only applies if the position of trust "contributed in some significant way to facilitating the commission or concealment of the offense."  Ron Schoenfeld was a transportation manager with limited discretionary authority.  He was not a fiduciary or employee with "substantial discretionary judgment that is ordinarily given considerable deference."  The adjustment focuses on a person of power, a fiduciary, using that position to take advantage of people with less power using his or her services.  Here the power relationship is completely reversed with the intent of the adjustment.  PG&E is a multibillion-dollar corporation, that employed the services of a third-party

contract manager to supervise logistics contracting. Schoenfeld's "taking" from PG&E was his duty of loyalty and honest services. That taking is similar, and we may be exaggerating here, to individuals who jump family members to the head of the installation que. Schoenfeld did not take from those with less power. He took an intangible right from PG&E, a far more powerful entity. Schoenfeld's authority was limited and supervised. The vast majority of contracts with Silver were approved by a Portfolio Manager, a Director of Sourcing, or a Senior Vice President of Shared Services depending on the value of the contract and the particular line of business. The contracting system was designed to minimize Schoenfeld's discretion. The contracts were not actually between Silver and PG&E, but between Silver and a third-party contract management agency, Logica. Silver and All American were twice nominated as the Supplier of the Year. The issue was not the quality of the contracted services. It was Schoenfeld's failure to disclose the kickbacks from his cousin. Schoenfeld was a disloyal employee. He was not an embezzling fiduciary.

### III. THE GOVERNMENT AGREES THAT A DOWNWARD DEPARTURE FOR COOPERATION IS APPORPRIATE.

Paragraph 79 of the plea agreement fails to recognize that the government will be moving for a downward departure in this case. Ron Schoenfeld did not commit this crime by himself; and he admitted his responsibility both to his employer and to the government. He made his admission to his employer, years ago, in October of 2014; and he more recently agreed to be debriefed by the government. During that debriefing, he again took full responsibility for violating PG&E's rules and agreed to testify, if testimony would be required. For its own reasons, the government chose not to indict Deborah Silver, who earned far more money than Ron Schoenfeld; and that may be the reason for the relatively small amount of departure recommended, but nevertheless, the government has acknowledged Ron Schoenfeld's cooperation and joins with the defense in requesting a departure. As the Court is well aware, once the government moves for a downward departure, the Court is free to consider that motion, but is not limited by the amount of a departure that the government suggests. See e. g. United States v. Udo, 963 F.2d 1318, 1319 (9th Cir. 1992).

Here, because of the length between the time of the offenses, initial omission, and today, Schoenfeld's sincere and forthright cooperation, and the government's failure to prosecute the person

who received the largest financial benefit from the offense.  A substantial downward departure is warranted.

## IV.  RON SCHOENFELD'S GUIDELINES AS REFLECTED IN THE PSR ARE NOT REFLECTIVE OF HIS CRIMINAL CONDUCT AS THEY OVERSTATE HIS CRIMINAL LIABILITY AND LIKELIHOOD OF RECIDIVISM

### A. The Circumstances of the Offense and the Offender, and the Coronavirus Pandemic are reasons for a Variance in this case.

In <u>Booker</u>, the Supreme Court held that district courts must consider the guideline range as advisory, not mandatory, and that they must also consider the other directives set forth in 18 U.S.C. § 3553(a).  <u>United States v. Booker</u>, 543 U.S. 220 (2005).

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in Section 3553(a)(2):

> (A) retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
> (B) deterrence;
> (C) incapacitation ("to protect the public from further crimes"); and
> (D) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner")

The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision."  The parsimony provision is not just another factor to be considered along with the others set forth in Section 3553(a) – it sets an independent limit on the sentence a court may impose.  <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007) (referring to the clause as an "overarching provision" that, post-<u>Booker</u>, "permits the court to tailor the sentence" to the individual defendant and crime in light of the goals of the Sentencing Reform Act of 1984).

The Sentencing Commission itself has recognized the need for alternative sentences that do not involve a prison term stating:

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems.  For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration.  Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.

1  https://www.ussc.gov/research/research-publications/2009-report-alternative-sentencing-federal-

2  criminal-justice-system (last accessed October 29, 2020).

3          In this case, a probationary sentence conditioned upon a period of house arrest is more than

4  sufficient to satisfy the goals of sentencing.

5          In determining if the sentence is minimally sufficient to comply with Section 3553(a)(2) purposes

6  of sentencing, a court should consider several factors listed in Section 3553(a).  These are:

7                      (1) the nature and circumstances of the offense and the history and characteristics
                    of the defendant;
8                      (2) the kinds of sentence available;
                    (3) the guidelines and policy statements issued by the Sentencing Commission,
9                  including the (now non-mandatory) guideline range;
                    (4) the need to avoid unwarranted sentencing disparity; and
10                     (5) the need to provide restitution where applicable.

11  18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7).

12          Neither the statute itself nor Booker suggests that any one of these factors is to be given greater

13  weight than any other factor.  However, it is important to remember that all factors are subservient to

14  Section 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four

15  purposes of sentencing.

16          Here, all of the Section 3553 factors call out for a lenient sentence in this case.

17      **B.  The Nature and Circumstances of the Offense and the Offender and the Coronavirus
         Pandemic Indicate that a Sentence of Probation is  Appropriate in this Case**
18

19      The offense of conviction in this case is conspiracy to commit wire fraud.  Ron Schoenfeld did

20  not steal funds from PG&E and PG&E was very happy with the services his cousin provided.  Ron

21  Schoenfeld was foolish and stupid, but his crime was not designed to hurt PG&E.

22          Research regarding white-collar offenders found no difference in the deterrent effect of probation

23  and that of imprisonment.  See David Weisburd et al., Specific Deterrence in a Sample of Offenders

24  Convicted of White-Collar Crimes, 33 Criminology 587 (1995); see also Zvi D. Gabbay, Exploring the

25  Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J.

26  Conflict Resol. 421, 448-49 (2007)("[T]here is no decisive evidence to support the conclusion that harsh

27  sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

28  Accordingly, there is no need for a prison sentence in the case.

## C. The Years of Uncertainty and Financial Penalties in this Case are Sufficient to Deter Others

This prosecution and the press release about this prosecution have already sent a strong message that there are real penalties for not disclosing relationships to an employer. There is no need for a term of incarceration to send a message to others. That message has already been sent and heard, not only by the general public, but also by the employees of PG&E.

## D. There is Little Chance of Recidivism in this Case

This case arose from an unusual set of circumstances where PG&E was looking for female contractors and Ron Schoenfeld was in a position to assist his female cousin who owned a trucking business. He viewed his assistance to his cousin as a win for her, a win for PG&E and a win for himself. The results of his crimes have been devastating to Ron Schoenfeld and his entire extended family. A google search for Ron Schoenfeld used to return results showing his employment and community service. That search now returns headlines about his guilty plea and potential jail sentence. Ron Schoenfeld was a gregarious outgoing character with lots of friends at PG&E and a member of a tight night family. His relationship with portions of his family has been shattered and he has been shunned by his former friends at PG&E. This was really a one of a kind, situational event and there is no need to deter Ron Schoenfeld from similar conduct in the future. Moreover, as a practical matter, Ron Schoenfeld is retired and probably unemployable. As he indicated in this statement accepting responsibility, Ron Schoenfeld and his entire family have learned a valuable lesson.

## E. The Circumstances of the Offense and the Offender, and the Coronavirus Pandemic are reasons for a Variance in this case.

Finally, and significantly, the Coronavirus situation in the Bureau of Prisons is an additional reason for a variance. If Schoenfeld would be sentenced to report to prison and enter custody before the coronavirus is meaningfully controlled or a vaccine is readily available, such a sentence would violate 18 U.S.C. § 3553 as unjust punishment, as well as the Eighth Amendment. The United States Supreme Court has held that the risk of contracting a serious disease may indeed constitute an unsafe, life-threatening condition that violates the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 33 (1993). The Supreme Court has stated that it would "be odd to deny an injunction to inmates who plainly

proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." Id.

The Court is familiar with the many motions from inmates seeking compassionate release, and the status of the Bureau of Prison's response to the coronavirus and conditions in the BOP, as well as the Court's own Orders granting Compassionate Release Motions, See e.g. United States v. Pikard, 2:11-cr-00449-KJM.  Other district courts have issued similar Orders reducing prison sentences due to the pandemic:

> By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. See, e.g., United States v. Stephens, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020); United States v. Barkman, No. 3:19-cr-0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020); In the Matter of Extradition of Toledo Manrique, No. 3:19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020). The chaos has already begun inside federal prisons—inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual. See, e.g., Sadie Gurman, Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus, Wall Street Journal (March 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075. To avoid adding to the chaos and creating unnecessary health risks, offenders who are on release and scheduled to surrender to the Bureau of Prisons in the coming months should, absent truly extraordinary circumstances, have their surrender dates extended until this public health crisis has passed.

Order Deferring Surrender Date, United States v. Garlock, Case No. 3:18-cr-00418-VC (N.D. Cal. March 25, 2020), Doc. No 41.

Schoenfeld's documented medical conditions indicate he is at a high risk for both infection and a bad outcome should he be infected.  He has sleep apnea, high blood pressure, diabetes, is obese, and 65. Unfortunately these factors work together synergistically to place Schoenfeld in a high-risk population. According to his doctor who began treating Schoenfeld before anyone even thought about the current pandemic: "His past medical history if significant in that it includes the following: hypertension, diabetes mellitus, hyperlipidemia, morbid obesity, and obstructive sleep apnea.  Given these perilous times with the current COVID19 pandemic, he is at severe risk of cardiopulmonary complications should he be exposed to this virus which of course would be aggravated in the event of his confinement."

Not only have jails been described as the perfect petri dishes for COVID-19 infection[1], the process where inmates go from one jail to another in transport to their final destination contributes to the spread of the virus in each of those jails and to each separate potentially infected population of inmates, guards, and their contacts.

In Incarceration And Its Disseminations: COVID-19 Pandemic Lessons From Chicago's Cook County Jail by Eric Reinhart and Daniel Chen[2] the Abstract states:

Abstract: "Jails and prisons are major sites of novel coronavirus (SARS-CoV-2) infection. Many jurisdictions in the United States have therefore accelerated release of low-risk offenders. Early release, however, does not address how arrest and pre-trial detention practices may be contributing to disease spread. Using data from Cook County Jail, in Chicago, Illinois, one of the largest known nodes of SARS-CoV-2 spread, we analyze the relationship between jailing practices and community infections at the zip-code level. We find that jail cycling is a significant predictor of SARS-CoV-2 infection, accounting for 55 percent of the variance in case rates across zip codes in Chicago and 37 percent in Illinois. By comparison, jail cycling far exceeds race, poverty, public transit utilization, and population density as a predictor of variance. The data suggest that cycling through Cook County Jail alone is associated with 15.7 percent of all documented novel coronavirus disease (COVID-19) cases in Illinois and 15.9 percent in Chicago as of April 19, 2020. Our findings support arguments for reduced reliance on incarceration and for related justice reforms both as emergency measures during the present pandemic and as sustained structural changes vital for future pandemic preparedness and public health."

COVID-19 is materially affecting the operations of all BOP facilities, as reflected by the fact that the Bureau has placed all facilities on lockdown. Social and legal visits are suspended. Inmate internal movement is suspended. Official staff training and travel is suspended.[3] Although some facilities have already experienced mass outbreak and multiple deaths, this does not diminish COVID-19's impact on those facilities that are not there, yet, and transfer to home confinement is not a zero-sum game. As the Attorney General exhorted, "time is of the essence."[4]

Any government claim that inmates are safe in custody is contradicted by the realities of institutional confinement, BOP's documented failure to provide adequate care, and the consensus of

---

[1] https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last accessed October 29, 2020).

[2] Available at https://www.healthaffairs.org/doi/10.1377/hlthaff.2020.00652 (last accessed October 29, 2020).

[3] BOP Implementing Modified Operations. https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed October 29, 2020)

[4] Barr 4/3/2020 Memo at 2.

public health experts that deincarceration is necessary to slow COVID-19's transmission. As of the date of this writing, the BOP reports that more than twenty thousand inmates and staff have been infected with the corona virus and 132 people have died.[5] The BOP infection rate is nearly 5 times greater when compared to the infection rate of the rest of the United States population.[6] In short, "our jails are petri dishes."[7]

When asked whether the BOP's figures "could be relied upon as an accurate reflection of the number of inmates and staff that are infected," BOP Public Information Supervisor Sue Allison acknowledged that "reporting of cases while tied to positive cases, does not necessarily account for unconfirmed (non-tested) cases."[8] As the district court noted in United States v. Esparza, "testing inside prisons has been scant except for people who self-report symptoms — which means that statistics about the number of infections already in BOP facilities are largely meaningless." United States v. Esparza, No. 1:07-cr-00294-BLW, 2020 U.S. Dist. LEXIS 65271, at *7 (D. Idaho Apr. 7, 2020); see also Order at 5, United States v. Caddo, No. 3:18-cr-08341-JJT, ECF No. 174 (D. Ariz. Mar. 23, 2020) ("it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test packets").

Accordingly, the likelihood of a serious and undeserved adverse outcome of incarceration is a real reason, recognized by Congress, to vary from the sentencing guidelines in this case.

---

[5] https://www.bop.gov/coronavirus/ accessed 11.2.2020

[6] https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.8.28.pdf at page 5.

[7] https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last accessed October 29, 2020).

[8] Walter Pavlo, Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison, FORBES (Apr. 1, 2020), available at https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison. (last accessed October 29, 2020).

**F. CONCLUSION**

Under the circumstances of this case, where the object was not to take the money and run, but rather to provide assistance to both his employer and his cousin, it is unnecessary to incarcerate Ron Schoenfeld. Accordingly, we request the Court impose a probationary sentencing possibly supplemented by a period of home confinement.

Dated: November 02, 2020                        Respectfully submitted,

                                         _____/s/_____

                                         Christopher J. Cannon
                                         Matthew A. Laws
                                         Attorneys for Ron Schoenfeld