McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
TANYA B. SYED
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:20-CR-00150-KJM |
|---|---|
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1 |
| v. | |
| RONALD STEVEN SCHOENFELD, | DATE: November 16, 2020<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |
| Defendant. | |

## I.  INTRODUCTION

For almost eight years, defendant Ronald Steven Schoenfeld exploited his employment at Pacific Gas and Electric Company ("PG&E") and engaged in a sustained pattern of deceit that deprived PG&E of his honest services, to satisfy his personal greed. Schoenfeld concocted and facilitated a fraud scheme, pursuant to which he helped his cousin obtain lucrative transportation contracts from PG&E through the use of Schoenfeld's contacts and confidential information Schoenfeld had access to at PG&E. In return, Schoenfeld's cousin agreed to periodically pay him 2.5% of the value of those contracts in the form of illicit kickbacks of profits which—by operation of California law—belonged to PG&E and not Schoenfeld. As a result of their fraud conspiracy, Schoenfeld's cousin paid Schoenfeld a windfall of illicit kickbacks totaling at least $1,476,295.15, and both were enriched at the expense of PG&E, its investors, and Californians who utilize its services.

Investigators at PG&E uncovered Schoenfeld's scheme, and this prosecution followed. Schoenfeld agreed to a pre-indictment resolution of the charges against him and agreed to cooperate with the United States' investigation. That investigation, ultimately, did not result in charges against Schoenfeld's co-conspirators. Nevertheless, the United States hereby moves, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, for an approximate 10% downward departure from the low end of the 24 to 30 month Guideline range in the plea agreement between the parties. For the reasons that follow, the United States respectfully recommends the Court sentence Schoenfeld to 22 months' imprisonment, two months less than the low-end of the stipulated Guidelines range, and the only sentence sufficient but not greater than necessary to advance the interest of the factors in 18 U.S.C. § 3553(a). The United States also requests that the Court order Schoenfeld to serve a one-year term of supervised release, and pay restitution to PG&E in the amount of $1,476,295.15

## II. PROCEDURAL AND FACTUAL HISTORY

On August 31, 2020, pursuant to a written plea agreement between the parties, Schoenfeld waived indictment and pleaded guilty to conspiracy to commit honest services fraud in violation of 18 U.S.C. § 371. Docket 10, 12. The Presentence Report ("PSR") adequately recounts the facts related to the conspiracy to which Schoenfeld pleaded guilty and Schoenfeld's participation in that conspiracy. See PSR ¶¶ 5–16. In summary, Schoenfeld, after obtaining employment at PG&E, worked with his cousin to award her company transportation contracts in exchange for 2.5% of the value of those contracts. PSR ¶ 6. Throughout the years-long scheme, Schoenfeld actively concealed his relationship with his cousin while introducing her to key decision makers at PG&E and assisting her in obtaining PG&E contracts. PSR ¶¶ 6, 7. Schoenfeld engaged in numerous overt acts to advance the fraud scheme, including by assisting his cousin in obtaining an annual $12 million contract and increasing the rates of payments to be paid to his cousin, all in contravention of PG&E's policies and without required approvals. PSR ¶¶ 8–10, 13. Over nearly eight years, Schoenfeld's cousin's company received at least $82,133,142 worth of contracts from PG&E. PSR ¶ 16. As a direct result of his scheme to defraud PG&E, Schoenfeld received at least $1,476,295.15 in illicit kickback payments from his cousin. PSR ¶ 16. As set forth below in more detail, every dollar of those kickback payments was—as a matter of California law—the property of PG&E, which is now entitled to restitution from Schoenfeld.

### III. SENTENCING CALCULATION

#### A. Statutory Maximum Sentence

The maximum sentence that the Court can impose is five years of incarceration, a fine of $250,000, a three year period of supervised release, and a mandatory special assessment fee of $100.

#### B. Guidelines, Criminal History Calculation, and Cooperation

##### 1. The Plea Agreement

In the written plea agreement executed by the parties, the United States and Schoenfeld stipulated to the following Guidelines calculation:

(i) Offense Level:

    a. Base Offense Level: The base offense level is six (**6**). See U.S.S.G. §§ 2X1.1 and 2B1.1(a)(1).

    b. Specific Offense Characteristics:

        1) Fourteen (**+14**) levels are added because the defendant received kickback payments that exceeded $500,000 but less than $1,500,00. See U.S.S.G. § 2B1.1(b)(1)(H) and 2B1.1, Application Note 3(B).

(ii) Adjusted Offense Level: The adjusted offense level is twenty (**20**).

(iii) Acceptance of Responsibility: The government recommends a three-level reduction in offense level for Defendant's acceptance of responsibility as defined in U.S.S.G. § 3E1.1.

(iv) Total Offense Level: The total offense level is seventeen (**17**).

In the written plea agreement, the parties agreed to leave determination of Schoenfeld's criminal history category ("CHC") to the United States Probation Office. As set forth below, the United States Probation Office has concluded that Schoenfeld has no scoring prior criminal convictions and thus falls into CHC I. Based on a Criminal History Category I and a Total Offense Level 17, the applicable sentencing range, pursuant to the plea agreement, is **24 to 30 months' imprisonment**.

##### 2. The Guideline Calculation in the Presentence Report

The United States Probation Office has prepared a PSR to assist the Court in imposing sentence. Docket 16. The PSR reflects a two-level enhancement for an adjustment for abuse of position of trust, resulting in a Guideline calculation of 30 to 37 months imprisonment. PSR ¶ 28. The government is

not seeking this enhancement, and stands by the terms of the negotiated, written plea agreement between the parties.  See PSR ¶ 28.

        3.      Downward Departure for Cooperation

The government has moved, herein, to reduce Schoenfeld's sentence by approximately 10% from the low end of the Guidelines range stipulated to in the Plea Agreement, to twenty-two months.

**IV.      GOVERNMENT'S SENTENCING RECOMMENDATION**

The government recommends that the Court sentence Schoenfeld to 22 months' imprisonment, to be followed by one year of supervised release.  This includes the governments' recommendation of an approximate 10% downward departure from the low end of the stipulated Guidelines range included in the plea agreement pursuant to Section 5K1.1 for Schoenfeld's assistance, or an approximately 2-month reduction.  The government also recommends that the Court order Schoenfeld to pay restitution in the amount of $1,476,295.15, and a fine at the low end of the applicable Guideline range.  This sentencing recommendation is sufficient but not greater than necessary to advance the goals and interests of the 3553(a) factors.  Accordingly, and for the reasons stated more fully below, the Court should (1) decline Schoenfeld's request for a sentence of mere probation and impose a sentence of 22 months' imprisonment, the low end of the stipulated Guidelines range with an incorporated downward departure for cooperation; and (2) decline the recommendation of the United States Probation Officer and Schoenfeld's request for no restitution, and, instead, order Schoenfeld to pay mandatory restitution in the amount of $1,476,295.15.

       **A.**      **Downward Departure Pursuant to U.S.S.G. § 5K1.1**

The United States moves, pursuant to Section 5K1.1 of the Guidelines, to reduce Schoenfeld's sentence by approximately 10% from the low end of the range stipulated to in the plea agreement.  See Docket 12 at 9–11.  A 22-month sentence would constitute a reduction of two months from the low-end of stipulated Guideline range of 24 to 30 months.  The government's motion is based on Schoenfeld's cooperation with its investigation of federal crimes he and his co-conspirators committed in this matter. On or about February 24, 2020, Schoenfeld, in the presence of his counsel, participated in an interview with law enforcement agents and representatives of the United States Attorney's Office during which Schoenfeld provided incriminating information concerning his and his co-conspirators' conduct relating

to the criminal offenses with which he was subsequently charged. Schoenfeld agreed to testify at a criminal trial against his co-conspirators, if one became necessary, and to repeat the incriminating information he offered during the interviews, under oath.

During the interview, Schoenfeld admitted he saw an opportunity to make extra money while working for PG&E, and asked his co-conspirator for compensation in return for helping her obtain contracts at PG&E. Schoenfeld described his role in the conspiracy and how he helped his co-conspirator obtain contracts, including introducing her to influential individuals within PG&E and providing her with confidential information. Schoenfeld described active measures he took with his co-conspirator to hide their relationship, including avoiding meeting in places where PG&E employees were likely to meet and talking on the phone or in person to avoid leaving a paper trail. Schoenfeld identified a supplier code of conduct provided to his co-conspirator to help establish that his co-conspirator was aware that she was not permitted to give him gifts worth over $25. Schoenfeld admitted to receiving at least $1,476,295.15 in kickback payments from his co-conspirator. Schoenfeld admitted that he knew the conspiracy was in violation of his duties as a PG&E employee and identified another cousin as an additional potential co-conspirator, who helped set up the companies that were used to funnel the kickback payments paid pursuant to the conspiracy.

As set forth above, Schoenfeld agreed to testify against his co-conspirators, if necessary. No trial was required. In any event, Schoenfeld would likely have been a sub-optimal witness. His complicated familial relationships with his co-conspirators would have provided ample basis to assail his credibility on cross-examination, potentially undermining the weight of his testimony.

Additionally, the information Schoenfeld provided, while truthful, was not sufficient to support charges against his co-conspirators, in the absence of significant corroborating evidence. Nevertheless, a reduction of approximately 10% from the low-end of the sentencing range stipulated in the parties' plea agreement is appropriate in light of the specific facts of Schoenfeld's conduct in this case and all other relevant factors. Specifically, the reduction is warranted by Schoenfeld's willingness to offer incriminating information about himself and his co-conspirators, and his sincere offer to testify at a criminal trial, if required. Accordingly, the Court should sentence Schoenfeld to 22 months in custody, a sentence that is sufficient but not greater than necessary to advance the goals and interests of the

factors set forth in 18 U.S.C. § 3553(a), as further described below.

**B.     Nature, Circumstance, and Seriousness of Defendant's Offense**

A sentence of 22 months in custody is reasonable and not more than necessary to advance the goals and interests of the § 3553(a) factors. First, the nature, circumstances, and seriousness of Schoenfeld's criminal conduct is notable for its brazenness and scope. See PSR at ¶¶ 5–16. Over the course of almost eight years, Schoenfeld abused his employment at PG&E and engaged a fraud scheme organized around his persistent dishonesty and deception, all to enrich himself and his family members. See PSR at ¶¶ 5–16.

Schoenfeld actively concocted the scheme, offering to help his cousin obtain contracts from PG&E in return for financial consideration. See PSR at ¶ 6. He facilitated introductions of his cousin to decision makers at PG&E, and provided her with confidential competitor rate information. See PSR at ¶ 7. However, he did not limit himself to simply helping his cousin's company obtain these contracts. He helped his cousin obtain a $12 million contract in violation of PG&E's bidding policies. See PSR at ¶ 8. Buoyed by his success, he went further and increased the amount paid to his cousin's company by 220% for certain services in violation of PG&E's internal approval polices. See PSR at ¶ 9.

Throughout the conspiracy, Schoenfeld's cousin's company received at least $82,133,142 worth of contracts, and she paid Schoenfeld illicit kickbacks worth at least $1,476,295.15. But no amount of ill-gotten gain appeared to be enough for either conspirator. Motivated by personal greed, Schoenfeld maintained and nurtured the fraud conspiracy over almost eight years, and did not end it on his own volition, despite earning millions in the aggregate, for himself and his co-conspirator over that time. Schoenfeld's scheme finally came to an end only after PG&E employees discovered his unauthorized rate changes and initiated an internal investigation into Schoenfeld's abuse of his employment at PG&E. Only then did Schoenfeld's criminal exploitation of PG&E finally end. See PSR at 10.

Schoenfeld's conduct was not a mistake, a minor misstep, or a simple bad decision. It was egregious criminal conduct. It was a calculated and carefully planned effort to systematically cheat PG&E throughout the course of his employment, beginning at least three months after he was hired and not stopping until his lies were finally discovered, years later. By nearly any standard, Schoenfeld's criminal conduct in this case is severe. Schoenfeld abused his employment at PG&E to enrich himself

and his family members, circumventing PG&E's bidding policies and depriving PGE& of his honest services.  A sentence of 22 months in custody is sufficient but not greater than necessary to account for the brazen nature and circumstances of Schoenfeld's crimes and their seriousness.  See 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

### C. Need to Promote Respect for the Law and Provide Just Punishment

Second, a sentence of 22 months in custody is sufficient but not greater than necessary to promote respect for the law and to provide just punishment for Schoenfeld's crimes.  See 18 U.S.C. 3553(a)(2)(A).  Schoenfeld's brazen and willful criminal conduct signals his deep lack of respect for the laws of the United States.  Indeed, Schoenfeld's persistent and careful execution of a years-long fraud scheme makes clear that he was willing to gamble that he could disregard the law with impunity and, if he was caught, that he would not suffer significant punishment as a result of his criminal conduct.  This Court should impose a sentence of 22 months in custody to promote respect for the law, to provide just punishment, and to make clear to Schoenfeld that his gamble was ill-conceived.

### D. Need to Provide Deterrence and to Protect the Public from Further Criminal Conduct by Defendant

Third, a sentence of 22 months in custody is sufficient but not greater than necessary to provide specific and general deterrence to Schoenfeld and others who might contemplate participation in similar criminal conduct, and to protect the public from further criminal conduct by Schoenfeld.  See 18 U.S.C. § 3553(a)(2)(B) and (C). While Schoenfeld has no criminal history, his conduct during the almost eight years that he executed his honest services fraud scheme demonstrates his willingness to persist in long-term criminal conduct despite grave personal risk and the destructive consequences of his actions.  Schoenfeld's conduct also clearly demonstrates that he prefers to reserve to his own judgment which laws matter and which laws do not; which laws he will follow and which laws he will ignore.

Further, it is striking that Schoenfeld's first foray into criminal conduct (beyond his very old brushes with the law, see PSR ¶¶ 39-40) was the execution of a long-term and time-intensive fraud scheme that involved not just his own actions but included his recruitment of family members to advance his scheme.  Indeed, the effort required of Schoenfeld to develop and maintain his scheme for so long a period of time demonstrates his willingness to embrace a criminal idea and nurture it to its

worst outcome. In the absence of adequate deterrence, such a first step toward serious criminal conduct might not be the last.

Additionally, this Court should not overlook the value and impact of the general deterrence that arises from imposing a guideline sentence, instead of a dramatic variance to a term of probation. One Congressional purpose in enacting 18 U.S.C. § 3553 was to ensure that serious white collar crimes were more likely to be sentenced to imprisonment. See S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259. The law's deterrent interest is particularly compelling in the context of a long-running white collar scheme:

> Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.Rev. 721, 724 (2005). Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment.

United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006); 18 U.S.C. § 3553(a)(2)(B). General deterrence would be profoundly undermined if the punishment for honest services fraud, resulting in enrichment of at least $1,476,295.15, were only a light term of probation with no order to pay back the ill-gotten gains. The message would be that white-collar criminals stand to lose "practically none of their liberty", while being unjustly enriched. Id. That is no deterrence at all. Only a custodial sentencing with restitution can deter substantial, premeditated economic crime. See United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014); United States v. Peppel, 707 F.3d 627, 638 (6th Cir. 2013); see also United States v. Edwards, 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, J. concurring and dissenting) ("It is precisely at this point-when the thief of above-average education and wit is deciding whether to do the deed -- that reflection on probable prison time-general deterrence-can have an effect.").

Schoenfeld's scheme requires at least some time in prison to deter him and to distinguish his crime from a civil or administrative offense. See id. ("[S]ome crimes require at least some time in prison-no probatory sentence will be sufficient."). Otherwise, "It doesn't take a crystal ball to see that those occasional dishonest persons in the business community may make a slide-rule calculation that they can steal hundreds of thousands of dollars, maybe even millions, because if caught they see a

good chance that they can walk away with expressed contrition and probation. That is the result the Sentencing Guidelines have long worked to prevent." See Edwards, 622 F.3d at 1218 (dissent from denial of rehearing *en banc*).

Sentencing Schoenfeld to probation would have the unintended consequence of reducing respect for law and reducing sentencing uniformity. See 18 U.S.C. § 3553(a)(2)(A), (6). The public would be rightfully disappointed with a sentence for a businessman caught cheating in such a brazen and willful manner, who secured nearly $1.5 million in illicit profit, yet managed to avoid a day in prison. This Court can and should exercise its discretion consistent with the thoughts of those jurists troubled by the increasing number of white collar probationary sentences.

> Willful offenders who commit white collar crime, who steal intentionally hundreds of thousands or even millions of dollars, should receive some degree of forced incarceration. We know that often the poor and powerless criminal defendants who commit common larceny or theft will serve some hard time. The public, respecting our legal system, may find it difficult to believe . . . that persons who steal hundreds of thousands of dollars in intentional schemes over long periods of time will suffer little or no prison time.

United States v. Whitehead, 559 F.3d 918, 921 (9th Cir. 2009) (Bybee, dissenting in part). "We perhaps also ought to consider why it is that such light sentences are all too frequently handed out by district courts for white collar crimes." United States v. Ruff, 535 F.3d 999, 1006 (9th Cir. 2008) (Gould, J., dissenting).

### A. The Ongoing Coronavirus Pandemic Does Not Justify a Variance

The ongoing coronavirus pandemic does not justify a variance from the parties' stipulated Guidelines range and the government's specific sentencing recommendation. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant remain the same, despite the pandemic. See 18 U.S.C. § 3553(a)(2)(A)–C. Rather, a deferred surrender date would take into account the ongoing pandemic and mitigate its impact. Accordingly, instead of granting any variance to a reduced term or probation, the Court should impose a term of 22 months and—if the Court determines the pandemic necessitates some accommodation—order Schoenfeld's surrender date deferred for a reasonable period.

### B. A Sentence of Probation is Not Justified In this Case

The Court should decline Schoenfeld's request for a sentence of probation. Although statutorily permissible, the Guidelines do not authorize a sentence of probation in a case such as this. See Comment to U.S.S.G. § 5B1.1 (n.2) ("Where the applicable guideline range is in Zone C or D of the Sentencing Table (i.e., the minimum term of imprisonment specified in the applicable guideline range is ten months or more), the guidelines do not authorize a sentence of probation.") (citing U.S.S.G. § 5C1.1). The government disputes Schoenfeld's assessment that the nature, circumstances, and seriousness of his crimes, and his history and characteristics, warrant a drastic variance from the applicable Guidelines sentencing range. The government is already recommending a downward departure for Schoenfeld's assistance and cooperation. A further variance is not warranted. As set forth above, the opposite is true: the nature, circumstances, and seriousness of Schoenfeld's crimes warrant a sentence of incarceration, even when balanced against Schoenfeld's criminal history category and other characteristics.

### C. Restitution

The Mandatory Victim Restitution Act ("MVRA") defines a victim as "'a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." United States v. Anderson, 741 F.3d 938, 951 (9th Cir. 2013) (quoting United States v. Yeung, 672 F.3d 594, 600 (9th Cir. 2012)). A court "may award restitution under the MVRA only for loss that flows directly from 'the specific conduct that is the basis of the offense of conviction.'" United States v. May, 706 F.3d 1209, 1214 (9th Cir. 2013) (quoting United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 927 (9th Cir. 2001)). The amount of restitution that may be ordered in a criminal judgment is limited "by the victim's actual loss." United States v. Bussell, 504 F.3d 956, 964 (9th Cir. 2007). Thus, generally, a court may not order restitution to reflect a defendant's "ill-gotten gains.'" Anderson, 741 F.3d at 951. While the MVRA grants district courts "a degree of flexibility in accounting for a victim's complete loses," the court may "utilize only evidence that possesses 'sufficient indicia of reliability to support its probable accuracy.'" United States v. Waknine, 543 F.3d 546, 557 (9th Cir. 2008) (quoting United States v. Garcia-Sanchez, 189 F.3d 1143, 1148-49 (9th Cir. 1999)). The MVRA does not require courts to calculate restitution with exact precision, but some precision is required and "[s]peculation and

rough justice are not permitted.'" United States v. Kilpatrick, 798 F.3d 365, 388 (6th Cir. 2015). "The government has the burden of proving the amount of the loss by a preponderance of the evidence." Anderson, 741 F.3d at 951.

Particularly relevant in this case, the Ninth Circuit has held that an agent, like Schoenfeld here, may be ordered to disgorge to his principal, like PG&E here, all secret profits obtained through the principal-agent relationship. See United States v. Gamma Tech Indus., Inc., 265 F.3d 917, 929 (9th Cir. 2001). In Gamma Tech, the Ninth Circuit made clear that "an employer suffers a loss in the amount of secret profits accepted by its agent and is entitled to restitution in that amount." United States v. Gaytan, 342 F.3d 1010, 1012 (9th Cir. 2003) (discussing Gamma Tech, 265 F.3d at 929).

The Ninth Circuit in Gamma Tech affirmed the district court's decision that an order of restitution arising out of a kickback scheme like the one at issues in this case was appropriately based on California Labor Code section 2860. 265 F.3d at 929. That code section states:

> Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, *belongs to the employer*, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.

Cal. Lab. Code § 2860 (emphasis supplied). The district court in Gamma Tech found that, because the defendant had deprived his employer of the kickback money which belonged to the employer under California law, the employer suffered a loss in the amount of the kickbacks. The Ninth Circuit agreed and noted:

> California courts have recognized that, under principles of agency theory, "[u]nless otherwise agreed, an agent who makes a profit in connection with transactions conducted by him on behalf of the principal is under a duty to give such profit to the principal," and that this rule "is applicable although the profit received by the fiduciary is not at the expense of the beneficiary." Bank of Am. Nat'l Trust & Sav. Ass'n v. Ryan, 207 Cal.App.2d 698, 705-06, 24 Cal.Rptr. 739 (Cal.Ct.App.1962) (citing, in part, Cal. Labor Code section 2860); see also Savage v. Mayer, 33 Cal.2d 548, 551, 203 P.2d 9 (1949) ("All benefits and advantages acquired by the agent as an outgrowth of the agency, exclusive of the agent's agreed compensation, are deemed to have been acquired for the benefit of the principal, and the principal is entitled to recover such benefits in an appropriate action."). Indeed, we stated long ago in a similar context that "[i]t is a settled principle ... that a bank officer who receives a bonus or other consideration for procuring a loan of the bank's funds commits a breach of trust, and that the consideration so paid belongs to the bank and

may be recovered by it." Fleishhacker v. Blum, 109 F.2d 543, 545-46 (9th Cir. 1940).

Gamma Tech, 265 F.3d at 929.

In this case, just like the defendant in Gamma Tech, Schoenfeld was an agent of his employer, PG&E. In the factual basis to his plea agreement, Schoenfeld admitted that he acknowledged various essential agent-principle duties when he began working for PG&E, including that he would alert PG&E of potential and actual conflicts of interests arising out of his employment. See Docket 12 at A-1. But he did not do so with respect to the secret "rebate program" that he hatched with his co-conspirator. Instead, Schoenfeld hid that agreement and his secret, illicit profits from PG&E, for years. To be sure, PG&E would have gladly accepted the 2.5% rebate or discount that Schoenfeld and his co-conspirator settled on, and collected those funds from Schoenfeld. But Schoenfeld never gave PG&E the option to accept those proceeds, which California law makes clear belonged to PG&E and not Schoenfeld. See Cal. Lab. Code § 2860.

Because Schoenfeld, through his fraud, deprived PG&E of profits that, by operation of law belonged to it, every dollar of the kickbacks paid to Schoenfeld by his co-conspirator constitute loss suffered by PG&E as a direct result of Schoenfeld's criminal conduct. See Gamma Tech, 265 F.3d at 929 (citing Bank of Am. Nat'l Trust & Sav. Ass'n v. Ryan, 24 Cal.Rptr. 739 (Cal. Ct. App. 1962) (concluding the rule "is applicable although the profit received by the fiduciary is not at the expense of the beneficiary.")). Those kickback payments, and their aggregate total, are reflected in the discovery made available to Schoenfeld and the United States Probation Office. That definitive evidence forms the basis for the loss calculation in this case, which no party disputes. That evidence also more than satisfies the United States' burden to demonstrate PG&E's loss by a preponderance of the evidence for purposes of supporting a restitution award. Consequently, those losses are properly recoverable under the MVRA, and the Court should order restitution consistent with that evidence.

Accordingly, restitution in the total amount of $1,476,295.15 should be ordered in his case.

**D.     Fine**

In its informal objections to the draft PSR, the government argued that, in the event that the Court does not order full restitution in the amount of $1,476,295.15, an upward departure from the

Guidelines fine amount to the maximum statutory fine of $250,000 was warranted, a position the Probation Officer accepted and incorporated into the Final PSR. *See* ECF No. 16-1. The government explicitly withdraws this argument. Regardless of the restitution imposed in this case, the government asks only for a fine at the low-end of the Guideline range set forth in the PSR. See PSR ¶ 75.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Schoenfeld's request for probation and, instead, impose a sentence at the low-end of the stipulated Guideline range, taking into account a downward departure for cooperation: 22 months in prison. The Court should also order Schoenfeld to pay mandatory restitution of $1,476,295.15, and a fine.

Dated: November 11, 2020

McGREGOR W. SCOTT
United States Attorney

By: /s/ ANDRÉ M. ESPINOSA
ANDRE M. ESPINOSA
TANYA B. SYED
Assistant United States Attorneys