CHRISTOPHER J. CANNON, State Bar No. 88034
MATTHEW A. LAWS, State Bar No. 273697
Sugarman & Cannon
737 Tehama Street, No. 3
San Francisco, CA 94103
Telephone: 415-362-6252
Facsimile: 415-362-6431
chris@sugarmanandcannon.com

Attorneys for Defendant RONALD STEVEN SCHOENFELD

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-cr-00150-KJM |
| Plaintiff, | **DEFENDANT RON SCHOENFELD'S RESPONSE TO UNITED STATES' SENTENCING MEMORANDUM** |
| vs. | |
| RONALD STEVEN SCHOENFELD, | |
| Defendant. | |

## I.     INTRODUCTION

The government has filed an aggressive sentencing memorandum that uses florid language to exaggerate Ron Schoenfeld's conduct but ignores the reality that his conduct did not harm PG&E. While we are not excusing Schoenfeld's conduct, we would like to put that conduct in context for the Court and explain why, under the extraordinary facts of this case, and time, a prison sentence is not needed.

## II.     BACKGROUND

PG&E is a multibillion dollar company with more than 23,000.00 employees.[1] Ron Schoenfeld worked in the trucking division and knew PG&E was looking to give more business to women and minority owned business. His cousin, Deborah Silver, ran such a business and needed help in navigating the PG&E bureaucracy. Schoenfeld viewed his assistance to his cousin as a win, win, win, situation. PG&E would be able to meet its goals to diversify its supplier pool. His cousin would get the work; and

---

[1] https://www.pge.com/en_US/about-pge/company-information/profile/profile.page#:~:text=There%20are%20approximately%2023%2C000%20employees,in%20northern%20and%20central%20California. (last accessed November 12, 2020).

Schoenfeld would be compensated out of his cousin's profits. This was not a scheme to take the money and run. Rather, Schoenfeld saw himself more like a consultant who could help his cousin navigate the bidding process and at the time, he deluded himself into thinking it was not that much of a big deal, because PG&E was actually saving money by using All American Trucking rather than other more expensive, non-diverse business.

Once Schoenfeld realized how seriously PG&E took his conduct, more than 6 years ago, Schoenfeld forthrightly admitted what he had done, and his acceptance of responsibility continued as he waived the statute of limitations multiple times while the government investigation continued.

Schoenfeld accepted responsibility in 2014, and in the intervening 6 years has demonstrated there is no need for specific deterrence to deter future misconduct by Schoenfeld.

This prosecution has had the desired effect of generally deterring any other PG&E employees who may have been thinking about working around the handbook. Schoenfeld reports he had been shunned by longtime friends and PG&E employees, including one couple he has known since high school. He feels ashamed and embarrassed and has had to move to Arizona.

The government makes much of the fact that this scheme continued over 8 years. The reason the kickbacks continued is that All American provided a valuable, cost effective service, was actually recognized as the supplier of the year, and continued to provide quality services at lower prices than the competition. Schoenfeld's real value to his cousin was in helping her initially navigate the labyrinthine PG&E bureaucracy and be recognized as a viable bidder. Once she was so recognized, her excellent performance led to more and more business, and all Schoenfeld had to do was cash the checks.

As indicated above, Schoenfeld certainly betrayed his duty of loyalty to his employer, but he did not cost PG&E any money.

Finally, the current coronavirus situation makes a departure to a sentence of probation with a period of house arrest appropriate.

We do not have to remind the Court of the current coronavirus situation in the BOP. Although the government may attempt to persuade this Court that the situation in BOP facilities is under control and that detention in BOP facilities is safer than release to the community, these representations are not supported by the facts. On March 26, 2020, the Director pointed to the low rate of infection within

BOP's facilities as a testament to its planning and effectiveness. As of October 6, 2020, the United States had an infection rate of 22.71 per 1000 people while the imprisoned population in BOP had an infection rate of 108.27 per 1000 people. The BOP therefore has an infection rate nearly 5 times greater than that of the general population.

As of November 10, 2020, 135 inmates have died in BOP custody. Asked whether the BOP's figures "could be relied upon as an accurate reflection of the number of inmates and staff that are infected," BOP Public Information Supervisor Sue Allison acknowledged that "reporting of cases while tied to positive cases, does not necessarily account for unconfirmed (non-tested) cases." As the district court noted in United States v. Esparza, "testing inside prisons has been scant except for people who self-report symptoms — which means that statistics about the number of infections already in BOP facilities are largely meaningless." United States v. Esparza, No. 1:07-cr-00294-BLW, 2020 U.S. Dist. LEXIS 65271, at *7 (D. Idaho Apr. 7, 2020); see also Order at 5, United States v. Caddo, No. 3:18-cr-08341-JJT, ECF No. 174 (D. Ariz. Mar. 23, 2020) ("it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test packets"). Courts continue to be skeptical of BOP's reported infections and recoveries, believing the situation is worse that BOP claims. See e.g. United States v. Fernandez, No. 2:16-CR-00115-KJM, 2020 U.S. Dist. LEXIS 185485, at *17 (E.D. Cal. Oct. 5, 2020) (citing United States v. Schweder, No. 2:11-CR-00449-KJM, 2020 U.S. Dist. LEXIS 161708 (E.D. Cal. Sept. 3, 2020)).

Moreover, because of the BOP's attempts control the virus, inmates cannot take advantage of the additional good time reductions Congress made available through the CARES and FIRST STEP Acts. Prior to the CARES and FIRST STEP Acts, inmates could earn a maximum of 54 days a year in good time credits. The First Step Act allows additional time credits, or FTC, for participation in various recidivism reduction programs or productive activities authorized by BOP and successfully completed on or after January 15, 2020 https://www.bop.gov/inmates/fsa/faq.jsp#fsa_time_credits (last accessed November 12, 2020). Because of restrictions on movement in BOP facilities, the BOP has not yet been able to carry out the program for earning FTC credits, which all parties thought would be available when the this plea and its consequences were being discussed with the government by Schoenfeld and counsel.

Accordingly, we are requesting this Court place Schoenfeld on probation, but included a period of house arrest that the Court would deem sufficient to satisfy the goals of sentencing.

Dated: November 12, 2020

Respectfully submitted,

/s/
Christopher J. Cannon
Matthew A. Laws
Attorneys for Ron Schoenfeld